UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

NANCY PRESCOTT,

        Plaintiff,

                                                                 Case Number 11-11226

v.                                                           Honorable Thomas L. Ludington

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

_____/

**OPINION AND ORDER OVERRULING PLAINTIFF'S OBJECTIONS, ADOPTING REPORT AND RECOMMENDATION, DENYING PLAINTIFF'S MOTION TO REMAND, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND AFFIRMING JUDGMENT OF THE COMMISSIONER**

This case arises out of an application for social security benefits filed by Plaintiff Nancy Prescott. Defendant Commissioner of Social Security denied the application. Plaintiff appeals, contending that "substantial evidence does not support the hypothetical and resultant [residual functional capacity]" formulated by Administrative Law Judge John Ransom. Pl.'s Mot. Remand 3, ECF No. 14. Specifically, Plaintiff contends that Judge Ransom erred by not accounting for "the well-known effects of fatigue" that people with the Epstein-Barr virus experience — "[t]he necessity to [lie] down at unpredictable times during the day." *Id*. at 5.

The case was referred to Magistrate Judge Michael J. Hluchaniuk, who issued a report recommending that the Court deny Plaintiff's motion to remand, grant Defendant's motion for summary judgment, and affirm the decision of Judge Ransom. ECF No. 22. Discussing why the decision is supported by substantial evidence, Judge Hluchaniuk explains: "No treating source imposed this limitation on her or opined that she was restricted in this fashion. Indeed, plaintiff does not offer any opinion from a treating physician that she was more physically limited than as

found by the ALJ. Plaintiff relies solely on her own testimony and her husband's statements. However, the ALJ's credibility determinations are entitled to considerable deference and the undersigned finds no basis to disturb those findings." Report & Recommendation 18–19 (citations omitted).

Any party may file written objections to a report and recommendation. 28 U.S.C. § 636(b)(1). The district court "shall make a de novo determination of those portions of the report . . . to which objection is made." *Id*. The Court is not obligated to further review the portions of the report to which no objection was made. *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985).

Plaintiff filed a single objection to the report and recommendation. ECF No. 25. Reiterating her assertion that Judge Ransom should have given the testimony of Plaintiff and her husband greater weight, Plaintiff writes that "it is evident from the Report & Recommendation that the true nature and extent of [Plaintiff's] condition has never been properly analyzed. . . . The common symptom to both Fibromyalgia and Epstein[-]Barr Virus is the symptom of fatigue. Testimony of both Ms. Prescott and her husband is consistent with these two conditions. It is not dispositive to have a treating doctor statement to confirm the same." Pl.'s Objection 2, 3.

After considering Plaintiff's objection, the Court agrees with Judge Hluchaniuk's conclusion that Judge Ransom's decision both articulates why he discredited the testimony that Plaintiff was required to lie down at least three hours each day and is supported by substantial evidence.

When the intensity or persistence of a claimant's alleged symptoms are not supported by objective medical evidence, as in this case, "the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints 'based on a consideration of

the entire case record.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). The entire case record, the Sixth Circuit instructs, "includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record." *Id*. Moreover, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). The ALJ must, however, "explain his credibility determinations in his decision such that it 'must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Rogers*, 486 F.3d at 249 (quoting SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996)).

The court, in turn, must "accord the ALJ's determinations of credibility great weight and deference." *Jones*, 336 F.3d at 476. And when the ALJ articulates the reasons for his credibility determination, as in this case, the court's review is limited to reviewing whether the ALJ's decision is "reasonable and supported by substantial evidence." *Rogers*, 486 F.3d at 249.

Here, contrary to Plaintiff's objection, the record contains no objective medical evidence that "the true nature and extent" of Plaintiff's condition included "[t]he necessity to [lie] down at unpredictable times during the day." As Judge Ransom explained in his decision, there is no evidence Plaintiff "was advised to refrain from working or that any exertional limitations were placed on her activities of daily living." R. 20; *see id*. ("There is no evidence that normal activities of daily living were significantly reduced to the point that she could not have performed a limited range of sedentary work activity."). And while there is evidence that

Plaintiff was infected with the ubiquitous Epstein-Barr Virus,[1] "no physician indicated the symptoms were totally disabling. In fact, she was advised by a treating physician that the symptoms would improve with time." *Id.*

Judge Ransom's decision articulates the reasons for his credibility determination and is supported by substantial evidence. Accordingly, the Court will overrule Plaintiff's objection, adopt Judge Hluchaniuk's report and recommendation, deny Plaintiff's motion to remand, grant Defendant's motion for summary judgment, and affirm the decision of Judge Ransom.

**I**

**A**

The Social Security Act of 1935, 42 U.S.C. §§ 301-1397jj, creates several benefits programs, including the Disability Insurance Benefits Program of Title II (42 U.S.C. §§ 401 *et seq.*) and the Supplemental Security Income Program of Title XVI (42 U.S.C. §§ 1381 *et seq.*). "Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status," the Sixth Circuit explains, while "Title XVI benefits are available to poverty stricken adults and children who become disabled." *Slone v. Sec. Health & Human Servs.*, 825 F.2d 1081, 1082 n.1 (6th Cir. 1987) (citing Frank Bloch, *Federal Disability Law & Practice* § 1.1 (1984).

In this case, Plaintiff seeks disability insurance benefits pursuant to Title II. To be entitled to benefits under this title, "a person must have worked a sufficient number of calendar quarters (based not on actual quarters of work but on earnings from work per year) during his or

---

[1] *See generally Epstein-Barr Virus and Infectious Mononucleosis*, U.S. Centers for Disease Control & Prevention (May 16, 2006) ("Epstein-Barr virus, frequently referred to as EBV, is a member of the herpesvirus family and one of the most common human viruses. The virus occurs worldwide, and most people become infected with EBV sometime during their lives. In the United States, as many as 95% of adults between 35 and 40 years of age have been infected."), http://www.cdc.gov/ncidod/diseases/ebv.htm.

-4-

her lifetime and before the onset of disability. Then if the person cannot 'engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period' of a year or result in death, the person is entitled to monthly payments in an amount roughly proportional to past taxed earnings, within established benefit limits." Mark C. Weber, *Disability Rights, Disability Discrimination, and Social Insurance*, 25 Ga. St. U. L. Rev. 575, 580–81 (2009) (footnotes omitted) (quoting 42 U.S.C. § 423(d)(1)(A)); *see generally* Jon C. Dubin, *The Labor Market Side of Disability-Benefits Policy and Law*, 20 S. Cal. Rev. L. & Soc. Just. 1, 8–17 (2011) (discussing historical development of federal disability benefits programs); Samuel R. Bagenstos, *The Future of Disability Law*, 114 Yale L.J. 1, 10–18 (2004) (discussing historical reasons for changes to federal disabilities programs).

**B**

The Commissioner of Social Security determines whether a claimant is disabled in accordance with a five-step process. 20 C.F.R. § 404.1520(a)(4)(i)–(v). A claim is allowed when it is demonstrated that: (1) the claimant is not engaged in "substantial gainful employment"; (2) the claimant suffers from a severe impairment which has lasted or is expected to last for twelve continuous months; (3) the impairment meets or is equal to one of the enumerated impairments; (4) ; the claimant does not retain the "residual functional capacity" to perform his "past relevant work"; and (5) the claimant is unable to perform any other gainful employment in light of the claimant's "residual functional capacity, age, education, and work experience." 20 C.F.R. § 416.920(a)(4)(i)–(v). "The burden of proof is on the claimant throughout the first four steps of this process to prove that he is disabled." *Preslar v. Sec'y of*

*Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994) (citing 20 CFR § 404.1520 (1982)). "If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Id.*

## C

The Court reviews the decision to determine whether the "factual findings . . . are supported by substantial evidence." *Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028 (6th Cir. 1990) (citing 28 U.S.C. § 405(g)). Substantial evidence "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

As noted, a district court does not resolve conflicts of evidence or issues of credibility. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). If the administrative law judge's decision is supported by substantial evidence, it must be affirmed, even if substantial evidence supports the opposite conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir. 1999).

## II

Plaintiff is a fifty-eight-year-old woman. R. at 89. Applying for disability benefits on May 11, 2007, Plaintiff alleged that she became unable to work because of a disability on June 1, 1994. *Id.* Because Plaintiff's disability insurance lapsed on September 30, 1995, Plaintiff bore the burden of establishing that she became disabled sometime between June 1, 1994 and September 30, 1995. *See* R. at 90, 147; *see also* Pl.'s Mot. Remand 3 (acknowledging "Ms. Prescott's case is unusual from the standpoint that her insurance for disability expired on September 30, 1995, eleven years prior to filing her claim," and that "it is Ms. Prescott's burden

to show that she suffered from a disabling condition prior to her insurance lapsing on September 30, 1995").

**A**

Plaintiff had several health problems before June 1994. In 1990, for example, Plaintiff was diagnosed with diabetes. R. at 370. In November 1993, plaintiff sought treatment at an emergency room because of a "cough that has been present for the past week associated with shortness of breath on exertion." *Id*. at 418. Emergency room doctors diagnosed Plaintiff with bronchitis and discharged her with instructions to follow up with her family physician, Dr. Marcelino Barreto. *Id*. In December 1993, she was diagnosed with chronic bronchitis. *Id*. at 392.

In March 1994, Plaintiff again sought treatment at an emergency room. R. at 408. Discussing her medical history, the clinical report relates:

> Since November of 1993 she has been on and off of antibiotics. . . . She states that she is very tired. She is worried about chronic fatigue syndrome. She has had a history of cough, sneezing, sore throat and earache with cold, clammy and sweats and great fatigue on exertion and she is sleeping a lot.

*Id*. Plaintiff was diagnosed with acute bronchitis. *Id*. She was not, however, diagnosed with chronic fatigue syndrome. *See id*. (Indeed, the record contains no evidence that she has ever been diagnosed with chronic fatigue syndrome.) Again, the emergency room doctors discharged her with instructions to follow up with her family physician. *Id*. Plaintiff did so. *Id*. at 391.

On March 7, 1994, Dr. Barreto ordered Plaintiff to have blood work done to test for Epstein-Barr Virus (EBV) titers.[2] R. at 391. Plaintiff's test results showed Plaintiff had been

---

[2] A "titer" is "a measurement of the amount or concentration of a substance in a solution. . . . A titer measurement is expressed as a ratio, such as 1:40." *See generally A.D.A.M. Medical Encyclopedia*, U.S. National Inst. of Health (Aug. 16, 2011), http://www.nlm.nih.gov/medlineplus/ency/article/002328.htm

recently exposed and infected to EBV. *Id*. at 478. Plaintiff had a viral capsid antigen level of 989 (a level of 110 or greater is positive for recent or past exposure to EBV). *Id*. She had an early antigen level of 1:160 (a level of 1:10 or greater is positive for recent EBV infection or re-infection). *Id*. Meeting with Plaintiff on March 14, 1994, Dr. Barreto's notes reflect that he provided "reassurance to [Plaintiff]. It's just transitory situation. The only thing we are not able to tell her is how long it will take." *Id*. at 390. There is no evidence in the record that Dr. Barreto placed any exertional limitations on Plaintiff's activities or advised her to refrain from working. Plaintiff, moreover, does not contend that she was disabled in March 1994. Several months passed.

**B**

As noted, Plaintiff alleges that her disability began in June 1994. R. at 90, 147. In August 1994, Plaintiff's EBV titer levels were again tested. *Id*. at 476. Her viral capsid antigen level was 587 (down from a level of 989 in March 1994). *Id*. Her early antigen level was 1:40 (down from a level of 1:160 in March 1994). *Id*. Again, there is no evidence in the record that Dr. Barreto placed any exertional limitations on Plaintiff's activities or advised her to refrain from working.

In December 1994, Plaintiff went to the hospital emergency room, complaining that she had unexpectedly lost consciousness, fell, and injured her ankle. R. at 406–07. An x-ray revealed that the ankle was not fractured. *Id*. at 425. A CT scan revealed no abnormalities in the brain. *Id*. at 425. A doctor diagnosed Plaintiff with a sprained ankle and instructed her to follow up with a neurologist. *Id*. at 406–07. Plaintiff did so.

On December 12, 1994, neurologist Dr. Faith Fuentes examined Plaintiff. R. at 394–95. The examination revealed no abnormalities. *Id*. "Because her neurologic examination is normal at this time," Dr. Fuentes wrote, "I advised the patient to just monitor for recurrent symptoms and she will get in touch with me should she have any further spells. I advised her to take one aspirin per day in the meantime." *Id*. at 395.

In February 1995, Plaintiff again sought treatment at an emergency room. R. at 402–04. Complaining of a sore throat and fever, she was diagnosed with acute streptococcal pharyngitis (commonly referred to as strep throat). *Id*. at 403. Again, emergency room doctors discharged her and instructed her to follow up with her family doctor if she did not improve. *Id*.

On September 29, 1995, Plaintiff's EBV titer levels were again tested. R. at 470. Her viral capsid antigen level was 724 (up from a level of 587 in August 1994). *Id*. Her early antigen level was 1:20 (down from a level of 1:40 in August 1994). *Id*. Again, there is no evidence in the record that any exertional limitations were placed on Plaintiff's activities or that she was advised to refrain from working.

The next day, September 30, 1995, Plaintiff's disability insurance coverage lapsed. *See* Pl.'s Mot. Remand 3 (quoted above).

### C

Twelve years passed. During this time, Plaintiff saw a number of physicians regarding a number of complaints. No complaints, however, regard disabling fatigue, EBV, or fibromyalgia are recorded. *See, e.g.*, R. at 272, 308, 314, 317–18, 320–22, 324–25, 368–69, 381–82, 385–87. Again, there is no evidence in the record that any exertional limitations were placed on Plaintiff's activities or that she was advised to refrain from working.

## D

In 2007, Plaintiff filed for disability insurance benefits under Title II of the Social Security Act. R. at 89. The claim was denied. *Id*. at 49–53.

Plaintiff requested a hearing, which was held before Administrative Law Judge John A. Ransom on December 15, 2009. *See id*. at 29–48 (hearing transcript). At the hearing Plaintiff was asked:

> Q: [W]e're going to talk about your medical condition and I wanted to go to April 1990. That had to do with . . . five years before insurance ran out. And it had to do with Dr. Miller treating you for your diabetes? Do you remember him treating you?
> A: Yes, I was diagnosed in April of '90, I wasn't feeling well before that not knowing I was diabetic. I end up being hospitalized for the initial part. . . .
> Q: Okay. So now how did you, how, what was your medical status or what kind of problems besides your diabetes —well, let's talk about your diabetes. Between 1990 . . . and then remember the date here, the magic date is September of '95. What, what kinds of things were going as far as controlling your blood sugars and things like that? Were you having any problems?
> A: Diet. Diet and pills. I was extremely, extremely tired which if your sugar is high certainly [a]ffects that.
> Q: Were you taking naps or how do you, how do you —
> A: Well, yes, I had —
> Q: — remember you were tired?
> A: — I had some lab work done, of course, on regular basis as I was seeing Dr. [Barreto] at the time. And at that time I was also with the diabetes diagnosed [with EBV] and I, and at that time I really didn't know that much about [EBV]. I certainly found out as the years went on. I wouldn't even be able to tell you what numbers were normal and what was abnormal but as all things once you have something you find out what these things mean and maybe why I was so exhausted, why it was hard to take care of my younger child at the time. She was from ages three to eight or whatever in those years. Normal titers I guess they're called is 100, at one time mine was 787.
> Q: Yeah.
> A: So I was off the chart but I knew, whether I had numbers or not, I knew how exhausted I was. I was trying to think about employment, I was very, very blessed that my mother lived next door and —
> Q: How much were you sleeping or laying down by then?
> A: I would say an average per day besides sleeping at night three to five hours.
> Q: During the day?

  A: Yeah.

R. at 35–37. Plaintiff's husband also testified. He was asked by Plaintiff's counsel:

  Q: Was there anything that [Plaintiff] mentioned that you, or didn't mention that you want to talk about, you know, as far as maybe how long she had to lay down or frequency or anything like that or how it [a]ffected her daily life activities?
  A: I remember being alarmed that she couldn't do the things that she use[d] to do like the laundry and, you know, keeping up with the housework and taking care of the kids. We were fortunate have her mother living nearby and the kids could go over there and an aunt who lived down the street. So that would help me, I tried to do as much [of] the housekeeping as I could.
  Q: So in other words she got help from her mother and her aunt?
  A: And, and her aunt, yes.
  Q: What kind of help was that?
  A: With the cooking and doing laundry, we would sometimes take laundry over there to be done because I was working full-time and driving two hours a day to work.
  Q: Okay.
  A: So —
  Q: All right. Now anything about her bronchitis or diabetes that she didn't cover in her, you know, anything that you can remember that would [a]ffect her ability to work?
  A: I remember being concerned that she was so weak and this was not the woman I knew, you know, who always had a lot of energy and, you know, a lot of stamina and could do pretty much whatever she wanted to.

R. at 44–45.

  Finally, a vocational expert testified. *Id*. at 46–48. Judge Ransom asked the expert to assume that a hypothetical person could have performed low stress, sedentary work. *Id*. at 47. With this assumption, Judge Ransom asked if there would have been significant numbers of jobs in the regional economy that Plaintiff could have performed. *Id*. Altering the hypothetical, Judge Ransom asked whether a hypothetical claimant who needed to lie down for three hours during the working day would still be able to perform these jobs. *Id*. at 47–48. The vocational

expert responded that if the hypothetical person "will need to lie down during the scheduled work hours, three hours, that would preclude employment." *Id*. at 48.

E

In February 2010, Judge Ransom issued a decision denying Plaintiff's application for disability benefits. R. at 13–22. Appling the five-step disability analysis to Plaintiff's claim, at step one Judge Ransom found that Plaintiff had not engaged in substantial gainful activity from the alleged onset date of June 1, 1994 through September 30, 1995. *Id*. at 18. At step two, Judge Ransom found that Plaintiff had the following severe impairments: degenerative disc disease, diabetes mellitus, fibromyalgia/Epstein-Barr virus, and rheumatoid arthritis. *Id*. At step three, Judge Ransom found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. *Id*. At step four, Judge Ransom found that Plaintiff did not have any past relevant work. And at step five, Judge Ransom denied the application for benefits because Plaintiff could perform a significant number of jobs available in the national economy. *Id*. Explaining his finding, Judge Ransom wrote:

> There is no evidence that prior to the date of last insured status claimant was advised to refrain from working or that any exertional limitations were placed upon her activities of daily living. Claimant had diabetes which was under reasonable control with medication and did not require insulin. She had some degenerative disc disease of the spine although there is no evidence that it resulted in significant functional limitations and she did not undergo consultation with a surgeon. She also had fibromyalgia/[EBV] although no physician indicated the symptoms were totally disabling. In fact, she was advised by a treating physician that the symptoms would improve with time. . . . There is no evidence that normal activities of daily living were significantly reduced to the point that she could not have performed a limited range of sedentary work activity.

R. at 20. Plaintiff requested a review by the appeals council. *See id*. at 1. The council declined to review Judge Ransom's decision. *Id*. This appeal followed.

**F**

In March 2011, Plaintiff filed suit in this Court. ECF No. 1. The case was referred to Judge Hluchaniuk pursuant to 28 U.S.C. § 636. ECF No. 3. In August 2011, Plaintiff filed a motion to remand the case to Defendant, contending that the decision was not supported by substantial evidence because "There is nothing within the Decision that addresses the claimant's rather severe fatigue and need to lie down during the day." Pl.'s Mot. Remand 6. Defendant, in turn, moved for summary judgment. The decision should be affirmed, Defendant argued, as "Plaintiff's citation to the presence of the EBV virus fails to prove that she needed to lay down during the day. Ninety-five percent of adults over age 35 have been exposed to the EBV. Moreover, none of Plaintiff's physicians indicated that Plaintiff needed to lay down during the day or indicated that she had any work-related functional limitations." Def.'s Mot. Summ. J. 2.

In August 2012, Judge Hluchaniuk issued a report recommending that the Court deny Plaintiff's motion, grant Defendant's motion, and affirm Judge Ransom's decision.

Plaintiff filed a single objection to the report and recommendation.

**III**

In her objection to the report, Plaintiff writes that the report does not accurately assess "the highly technical nature of Ms. Prescott's illness." Pl.'s Objection 2. As noted, she elaborates that "it is evident from the Report & Recommendation that the true nature and extent of [Plaintiff's] condition has never been properly analyzed. . . . The common symptom to both Fibromyalgia and Epstein Barr Virus is the symptom of fatigue. Testimony of both Ms. Prescott and her husband is consistent with these two conditions. It is not dispositive to have a treating doctor statement to confirm the same." *Id*. at 2, 3. Plaintiff's objection — essentially, that

greater weight should be accorded to the testimony of Plaintiff and her husband — is unpersuasive.

After considering Plaintiff's objection, the Court agrees with Judge Hluchaniuk's conclusion that Judge Ransom's decision both articulates why he discredited the testimony that Plaintiff was required to lie down at least three hours each day. Moreover, Judge Ransom's decision is supported by substantial evidence.

As Judge Hluchaniuk cogently observed in his report and recommendation, "there is no documented specific requirement in the medical records that plaintiff needs to lie down during the day either periodically or as extensively as she claims. No treating source imposed this limitation on her or opined that she was restricted in this fashion. Indeed, plaintiff does not offer any opinion from a treating physician that she was more physically limited than as found by the ALJ." Report and Recommendation 18.

Likewise, as Judge Ransom explained in his decision, there is no evidence Plaintiff "was advised to refrain from working or that any exertional limitations were placed on her activities of daily living." R. 20; *see id.* ("There is no evidence that normal activities of daily living were significantly reduced to the point that she could not have performed a limited range of sedentary work activity.").

To once again review the medical evidence, in March 1994 Dr. Barreto ordered Plaintiff to have blood work done to test for EBV. R. at 391. Plaintiff's test results showed Plaintiff had been recently exposed and infected to EBV. *Id.* at 478. She had a viral capsid antigen level of 989 and an early antigen level of 1:160. *Id.* Meeting with Plaintiff on March 14, 1994, Dr. Barreto's notes reflect that he provided "reassurance to [Plaintiff]. It's just transitory situation.

-14-

The only thing we are not able to tell her is how long it will take." *Id*. at 390. There is no evidence in the record that Dr. Barreto placed any exertional limitations on Plaintiff's activities or advised her to refrain from working. *Cf. Nunn v. Bowen*, 828 F.2d 1140, 1145 (6th Cir. 1987) (concluding that since none of the medical doctors indicated that the plaintiff should restrict his activities because of his alleged disability, "it was not erroneous for the ALJ to determine that [the plaintiff] did not have a combination of impairments that would lead to a determination of disability for social security purposes").

Plaintiff, moreover, does not contend that she was disabled in March 1994 when she was diagnosed with a viral capsid antigen level of 989 and an early antigen level of 1:160. Rather, she contends her disability began in June 1994.

Several months passed.

In August 1994, Plaintiff's EBV titer levels were tested again. R. at 476. Her viral capsid antigen level was 587 (down from 989). *Id*. Her early antigen level was 1:40 (down from 1:160). *Id*. Again, there is no evidence in the record that Dr. Barreto placed any exertional limitations on Plaintiff's activities or advised her to refrain from working at this time.

On September 29, 1995, Plaintiff's EBV titer levels were tested for a third time. R. at 470. Her viral capsid antigen level was 724 (up from a level of 587 in August 1994). *Id*. Her early antigen level was 1:20 (down from a level of 1:40 in August 1994). *Id*. Again, there is no evidence in the record that any exertional limitations were placed on Plaintiff's activities after this test. The next day, September 30, 1995, Plaintiff's disability insurance lapsed.

None of this objective medical evidence suggests that "the true nature and extent of [Plaintiff's] condition has never been properly analyzed." Pl.'s Objection 2. Rather, Judge

Ransom reasonably found that Plaintiff had some physical limitations but was not completely disabled. His decision limiting her residual functional capacity to sedentary work is supported by substantial evidence. *See* SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996) ("Under the regulations, 'sedentary work' represents a significantly restricted range of work. Individuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations.").

Reinforcing this conclusion is Social Security Ruling 99-2p, which provides guidance for "claims for disability on the basis of Chronic Fatigue Syndrome" (a disability that Plaintiff has never been diagnosed with and does not claim). SSR 99-2P, 1999 WL 271569, at *1 (April 30, 1999). Observing that there is no widely accepted test for chronic fatigue syndrome (CFS), Social Security Ruling 99-2p nevertheless establishes EBV titer count benchmarks for establishing "the existence of a medically determinable impairment":

> At this time, there are no specific laboratory findings that are widely accepted as being associated with CFS. However, the absence of a definitive test does not preclude reliance upon certain laboratory findings to establish the existence of a medically determinable impairment in persons with CFS. Therefore, the following laboratory findings establish the existence of a medically determinable impairment in individuals with CFS:
>
>> An elevated antibody titer to Epstein-Barr virus (EBV) capsid antigen equal to or greater than 1:5120, or early antigen equal to or greater than 1:640.

*Id*. at 3 (footnote omitted).

Plaintiff's capsid antigen count, as noted, was 587 in August 1994, 724 in September 1994. Both are substantially lower than the 1:5,120 benchmark established by Social Security Ruling 99-2p.

Likewise, Plaintiff's viral antigen count was 1:40 in August 1994, 1:20 in September 1994. Both are substantially lower than the 1:640 benchmark established by Social Security Ruling 99-2p.

In sum, Judge Ransom's decision articulates the reasons for his credibility determination and is supported by substantial evidence. Accordingly, the Court will overrule Plaintiff's objection, adopt Judge Hluchaniuk's report and recommendation, deny Plaintiff's motion to remand, grant Defendant's motion for summary judgment, and affirm the decision of Judge Ransom.

## IV

Accordingly, it is **ORDERED** that Plaintiff's objection to Judge Ransom's report and recommendation (ECF No. 25) is **OVERRULED**.

It is further **ORDERED** that the Judge Ransom's report and recommendation (ECF No. 22) is **ADOPTED**.

It is further **ORDERED** that Plaintiff's motion to remand (ECF No. 14) is **DENIED**.

It is further **ORDERED** that Defendant's motion for summary judgment (ECF No. 20) is **GRANTED**.

It is further **ORDERED** that the findings of the commissioner are **AFFIRMED** and Plaintiff's complaint (ECF No. 1) is **DISMISSED**.

                                                            s/Thomas L. Ludington
                                                            THOMAS L. LUDINGTON
                                                            United States District Judge

Dated: September 11, 2012

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 11, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS
